320 So.2d 99

**Herman FRAZIER**

v.

**STATE.**

**7 Div. 365.**

Court of Criminal Appeals of Alabama.

Oct. 1, 1975.

William T. Denson, Rockford, for appellant.

William J. Baxley, Atty. Gen., and Carol Jean Smith, Asst. Atty. Gen., for the State.

**168**

HARRIS, Judge.

Frazier was convicted of robbery and sentenced to ten years in the penitentiary. He had appointed counsel both at arraignment and trial. He pleaded not guilty. After conviction he gave notice of appeal without suspension of sentence and was furnished a free transcript. Trial counsel was appointed to represent him on appeal.

Omitting the formal parts the indictment reads as follows:

"The Grand Jury of said County charge that before the finding of this Indictment Herman Frazier alias Herman Frazure whose true name is to the Grand Jury unknown, otherwise than as stated, feloniously took $400.00 in lawful currency of the United States of America, a more particular description of which is to the Grand Jury otherwise unknown, of the value of $400.00 and one 38 Caliber Derringer pistol Serial No. 029257 of the value of $60.00, the property of Walter Farr, from his person and against his will by violence to his person or by putting him in such fear as unwillingly to part with the same, against the peace and dignity of the State of Alabama."

On October 29, 1974, Mr. Walter Farr, age seventy-five, lived in the Barfield Community of Clay County about five miles from Lineville, Alabama. He owned and operated a service station on County Highway 9 close to his home. On that date, around two o'clock in the afternoon, two Negroes came to his service station and the driver asked him to put a dollar's worth of gas in his car. The driver was subsequently identified as appellant. Appellant's companion who was subsequently identified as Ricky Searcy got out of the car and walked in the service station. Searcy hollered from the door of the station and said, "Put in two more dollars worth of gas."

Mr. Farr further testified that this was a 1965 Chevrolet Impala, beige in color, and had a trailer hitch on the bumper and he noticed a broken radio aerial on the left rear fender. He noticed the tag number but could remember only the first two numbers. They were "11" and he knew that number represented Calhoun County. After putting the gas in the car Mr. Farr walked into the service station followed by appellant. As Mr. Farr started to go behind the counter Searcy grabbed his arm with his left hand and pointed a pistol in his face saying, "This is a stick-up, I want your money, give me your money or I will kill you." Appellant started closing in on Mr. Farr, and Mr. Farr raised his foot and shoved appellant off him. At this point Searcy struck Mr. Farr on the head and pushed him down on the floor and told him to lie flat and put his hands behind him. Both appellant and Searcy bound Mr. Farr's hands behind him using a piece of telephone wire. Mr. Farr said, "Take my money, but don't kill me."

Mr. Farr stated that Searcy took his billfold out of his pocket which contained around $400.00. He had a metal box under the counter and appellant took this box which had about twenty to thirty one dollar bills in it and some old silver. Mr. Farr had a .38 caliber double-barrel derringer pistol on the counter. It was not loaded but there were two cartridges on the counter. When Mr. Farr bought the pistol, he wrote down the serial number— "029257." Appellant took the pistol and the two cartridges.

Mr. Farr was bleeding profusely from his head as a result of the blow from the pistol in the hand of Searcy. He stayed on the floor in a pool of blood until he

heard the robbers crank the car and leave his station. He got up and walked out of the store calling his son who lived forty-five to fifty yards from the station. His son got his truck to carry him to a doctor in Lineville and while he was getting the truck, his wife helped untie Mr. Farr's hands.

While enroute to Lineville, they saw State Trooper Jack Whatley and they stopped and reported the robbery. Mr. Farr gave the trooper a description of the automobile as above described. He also described the two Negroes as to weight, height and what they were wearing. Mr. Whatley radioed the base station in Oxford, Alabama, and an all-points bulletin was dispatched for the suspects.

Mr. Farr's son, Richard Elton Farr, testified that he observed the 1965 Chevrolet pulled into his father's service station occupied by two black men. He saw the driver get out and go to the rear of this car. He did not think anything unusual was going to take place and he remained in his home. A short while later he heard his father hollering for him to come and look after him. He went to his father and saw blood coming down his face and it was going down on his shirt. He put him in his truck and started for Lineville to put him under the care of Dr. George Smith at the clinic. That it took sixteen sutures to close the laceration on his head.

On the way to Lineville, they saw Trooper Whatley and stopped and gave the trooper a description of the car and the occupants. Young Farr told Mr. Whatley that the car was an old Chevrolet, dark in color and that it had three tail lights across the back. He described the two black men. He stated one of the men looked to be about six feet tall and the other one was not quite as tall and "sort of chunky like."

Both Mr. Farr and his son made a positive in-court identification of appellant as one of the robbers.

State Trooper Jack Whatley confirmed the testimony of Mr. Farr and his son as to the description of the 1965 Chevrolet with a trailer hitch on the rear bumper. He called the base station and gave them a description of the car and the two men in it. He was told to go north on Highway 9 and about the time he got to the Hollis Crossroads, he received a radio call from another unit stating that he was in pursuit of the car that had been described. He then proceeded in that direction, I–20 and Highway 431, and found the car which had been stopped by another officer with the Oxford Police Department. One of the officers who stopped appellant found a derringer pistol lying on the front seat of appellant's car in "plain view." This officer gave this pistol to Trooper Whatley who turned it over to the Sheriff of Clay County when he arrived at the scene. Appellant had been removed from his car and was in the back seat of the Oxford Police car when Whatley arrived.

This officer further testified that just before appellant's car was stopped, he heard on his radio that Officer Pitts said that some things had been thrown out of the car on the passenger's side and gave the location as being on I–20 just at Highway 431. Officers Whatley and Pitts went to this location and found a metal box and a bunch of papers, cancelled checks and things of that nature. From an examination of these papers, it was determined that they belonged to Mr. Farr. There was no money in the box.

State Trooper Raymond Pitts who was stationed at Anniston, Alabama, picked up the broadcast on his radio and pulled upon the ramp at the 431 exit and stopped his car. Five or ten minutes later he saw a 1965 blue Chevrolet Impala on Highway 431 headed south and saw it turn right, going toward Calhoun County on the interstate. As he was pursuing this car, he saw a box thrown from the car and the papers from the box were scattered all over the

highway. He pursued the car for a half of a mile and when he came up to it, he found that Officer Ray Henson of the Oxford Police Department had stopped the car. Pitts looked in the car and saw a nickel-plated derringer lying on the front seat. Just as the Chevrolet was coming to a stop, he saw a black man running across a bank and he jumped the fence. He went into the woods trying to catch this man but he could not locate him. This officer made an in-court identification of appellant as the driver of the Chevrolet stopped by Officer Henson.

Police Officer Ray Henson of the Oxford Police Department testified that he was on patrol on October 29, 1974, and while on patrol, he received a radio dispatch giving a description of the car that was suspected of being involved in a robbery in Clay County. He spotted the car and gave chase going as fast as ninety miles per hour. He turned on the blue light and finally stopped the car. As the car was slowing down, he saw the occupant on the passenger side open the door and escape. He put the driver under arrest and hand-cuffed him. He gave him the *Miranda* rights and warnings. He made a personal search of the driver at the scene after his partner showed him a loaded derringer on the front seat of the car. He unloaded the pistol for safety reasons and gave the pistol and two cartridges to Trooper Whatley when he arrived on the scene. He made a positive in-court identification of appellant as the driver of the car he chased and finally stopped.

Henson further testified that in searching appellant at the scene, he told him to take off his hat. Inside the hat was a newspaper and inside the newspaper was marihuana or what appeared to be marihuana. At this point in the trial the following occurred:

"MR. DENSON: Objection, Your Honor, and I make a motion for a mistrial on the grounds that it's highly prejudi-cial. This man has been brought before the Bar of Justice and he is not charged with anything that relates to this, he is charged with robbery and I make a motion for a mistrial.

THE COURT: Overruled. The Court understands that and the Court notes that the defendant is not on trial for marijuana in this case.

MR. DENSON: Reserve an exception."

The pistol was introduced in evidence without objection and appellant's counsel stipulated that the automobile driven by appellant on this occasion was his automobile.

Ricky Searcy was called as a witness for the state. He testified that on October 29, 1974, he and appellant drove to Clay County in appellant's car. They had planned to rob the Farr service station before leaving Anniston. He stated that he pulled a .22 caliber pistol on Mr. Farr and hit him on the head in the presence of appellant; that he made Mr. Farr lie face down on the floor with his hands behind him and both he and appellant tied Mr. Farr's hands with wire they brought with them. He stated that he took Mr. Farr's billfold out of his pocket and that appellant got Mr. Farr's money box, pistol and cartridges.

He further testified that they got in Frazier's car and left to return to Anniston. He said that on the trip back they started counting the money and that Frazier watched him count every dollar. He got the money from the metal box and put it with the money from Mr. Farr's billfold. After counting it they rolled it up and put a rubber band around it. He stated that after the officers got after them, he threw the money and the money box out of the car and that he got out of the car and ran up the mountain. He said they counted $357.00. He said he had not been promised anything in exchange for his testimony or threatened in any way. He stated the reason he was testifying for the state was that he had been tried and convicted

and sentenced to twenty years in the penitentiary. That he did not think it was right for him to be going down the road by himself when Frazier had just as much to do with it as he had saying, "Yes, sir, I think he should go down there with me."

At the conclusion of the state's case counsel for appellant moved to exclude the state's evidence on the ground there was a fatal variance between the state's evidence as to the amount of money charged in the indictment as being four hundred dollars and the amount proven being much less. He further contended that the value of the pistol was stated in the indictment to be of the value of sixty dollars and according to Mr. Farr's own testimony, the value of the pistol was thirty-five dollars. The trial court overruled the motion.

Appellant offered two witnesses who testified as to the good character of appellant, and both testified that he possessed a good character.

On cross-examination both of these witnesses were asked if they had heard that appellant was arrested for assault with intent to murder in 1971, and arrested for burglary in 1973. Both answered they had not heard that. The District Attorney asked both witnesses if they had heard that if their answers as to appellant's good character be the same. Appellant's objections were overruled and both witnesses said their answers as to his good character would be the same.

Appellant testified in his behalf and denied that he participated in the robbery of Mr. Farr. That he was unaware that Searcy had planned to rob Mr. Farr and that he only carried him to Lineville as a favor, but Searcy did agree to buy the gasoline for the trip. He stated that he was a witness to the blow on Mr. Farr's head with a pistol in the hands of Searcy. He denied that he helped tie up Mr. Farr and that he did not take the money box or Mr. Farr's pistol. That this was done by Searcy alone. That after he heard Mr. Farr

say, "Take the money but please don't kill me," he just walked out of the station and got in his car. In sum, his testimony was that he just happened to be in the wrong place at the wrong time.

■ There was no fatal variance between the averments of the indictment and the proof as to the value of the property taken. In a robbery prosecution the amount of money taken is immaterial. *Wilson v. State*, 268 Ala. 86, 105 So.2d 66; *Turk v. State*, 53 Ala.App. 106, 298 So.2d 37.

■ There was no prejudicial error in denying appellant's motion for a mistrial because a personal search of appellant at the time of his arrest revealed he had marihuana in his hat. The search was incident to a lawful arrest. The court stated that appellant was on trial for robbery and not possession of marihuana. The word "marihuana" was not mentioned again during the entire trial. *Daniels v. State*, 290 Ala. 316, 276 So.2d 441.

■ Where witnesses testified as to the good reputation of the defendant, it was permissible on cross-examination to test their knowledge of the defendant's reputation by asking if they had heard of specific acts of the defendant that tended to mitigate against his reputation or character. In any event their negative answers were harmless to appellant. *Baldwin v. State*, 282 Ala. 653, 213 So.2d 819.

■ In *Mullins v. State*, 31 Ala.App. 571, 19 So.2d 845, the rule is stated to be:

" 'Confusion sometimes arises in distinguishing between the right to cross-examine a witness who testifies to good character as affecting his creditability and the prohibition against inquiring as to specific conduct. In the former inquiry it is complying with the rule for the opposing counsel to ask the witness if he has not heard of certain misbehav-

ior which would tend to mitigate against the character of the person whose good repute the witness is seeking to uphold.

This is allowed for the reason that an adversary has the right to test the accuracy, creditability and sincerity of a witness when the privilege of cross-examination is exercised. . . .

'In other words, on cross-examination of a witness who has testified as to the general good character of defendant, it is permissible to ask the witness if he had not heard it reported in the community that the defendant had committed certain unworthy acts, naming them, but this even is not allowed for the purpose of affecting the character of the defendant but as evidence affecting the credibility of the witness testifying to good character. *Carson v. State*, 128 Ala. 58, 29 So. 608; *Williams v. State*, 144 Ala. 14, 40 So. 405; *Smith v. State*, 103 Ala. 57, 15 So. 866. *Such examination is also permitted for the purpose of either showing that the witness was mistaken in his estimate, or for shedding light on his estimate of such character. Stout v. State,* 15 Ala.App. 206, 72 So. 762.' (Emphasis added)"

In *Brown v. State*, 21 Ala.App. 371, 108 So. 625, the court said: .

"There were several objections by defendant to questions propounded to witnesses, the objections overruled, and exceptions reserved; but when the questions were answered there were no motions to exclude. This was equivalent to a waiver. *Taylor v. State*, 20 Ala.App. 161, 101 So. 160; *Bailum v. State*, 17 Ala.App. 679, 88 So. 200.

There was no motion to exclude the state's evidence; there was no motion for a new trial; there was no request for the affirmative charge, and no exceptions were reserved to the court's oral charge to the jury. In this state of the record nothing is presented to this court for review. *Eady v. State*, 48 Ala.App. 726, 267 So.2d 516; *Grant v. State*, 46 Ala.App. 232, 239 So.2d 903; *Robinson v. State*, 46 Ala.App. 684, 248 So.2d 583.

We have carefully examined the record for errors injuriously affecting the substantial rights of appellant, and have found none.

The judgment of conviction is affirmed.

Affirmed.

All the Judges concur.